## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HIPOLITO GEROMINO (JERRY) PEREZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-CV-0533-CVE-FHM** |
| | ) | |
| **ST. JOHN MEDICAL CENTER AND THE** | ) | |
| **CARPENTERS LOCAL UNION #943, TULSA,** | ) | |
| **OKLAHOMA OF ARKANSAS REGIONAL** | ) | |
| **COUNCIL OF CARPENTERS OF UNITED** | ) | |
| **BROTHERHOOD OF CARPENTERS AND** | ) | |
| **JOINERS OF AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court is Defendant Local 943's Motion for Summary Judgment and Brief in Support of the Motion (Dkt. # 42) and Defendant St. John Medical Center's Motion for Summary Judgment with Supporting Brief (Dkt. # 43). Defendants argue that plaintiff was laid off from his position as a temporary carpenter at St. John Medical Center (St. John) when the project on which he was working was near completion and his services were no longer needed, and there is no evidence suggesting that plaintiff was laid off as a result of unlawful discrimination. Plaintiff responds that his alleged layoff was pretext for national origin discrimination, and St. John orchestrated a reduction in force to mask its alleged discriminatory conduct.

## I.

Hipolito Geronimo Perez is a carpenter and a member of The Carpenters Local Union # 943, Tulsa, Oklahoma of Arkansas Regional Council of Carpenters of United Brotherhood of Carpenters and Joiners of America (The Union). The Union is a voluntary organization and it maintains a non-exclusive hiring hall. Dkt. # 42, Ex. A, at 3. Employers may use the services of the Union to locate

a qualified carpenter, but carpenters and employers are free to contact one another without using the Union's hiring hall.  The Union maintains an out-of-work list for unemployed carpenters looking for work.  A Union member may ask the Union to place his name on the list, but he must provide information about his skill level and geographic locations where he is willing to work.  Upon requesting to be placed on the out-of-work list, the member is put on the bottom of the list, and gradually moves up the list as people above him obtain employment for a period of at least five days. Id.  If an employer requests the services of a Union carpenter, the Union refers to the out-of-work list and contacts the next qualified carpenter on the list.  Id. at 4.  The parties agree that this is the procedure used to refer Union members for work form the out-of-work list.  See Dkt. # 42, at 4-5; Dkt. # 54, at 3.

Perez asserts that he has had a tumultuous history with the Union since he was initially accepted into the Union in 1975.[1]  In 1997, Perez filed a claim with the National Labor Relations Board (NLRB) alleging that the Union failed to refer him to work for over 145 weeks, and Perez asserts that he prevailed on his claim.  Dkt. # 52-5, at 36.  The parties do not dispute that former Union member Jay Phillips assaulted Perez in September 1996 and former Union member Clay Vaughn assaulted Perez in April 2001.  Id. at 35.  In 1997, Phillips also spread rumors that Perez had "mental problems" and Perez feels that he still suffers some stigma from these rumors.  Perez claims

---

[1]     The Court provides the following information about Perez's history with the Union as background, but notes that he has not provided evidence to support many of his assertions. These allegations are stated in Perez's response to the Union's motion for summary judgment and he refers to his history with the Union throughout his response, and it necessary to review this information to understand his arguments in opposition to summary judgment.  However, under local rules of civil procedure, mere statements in a response to a motion for summary judgment may not be considered as evidence.  See LCvR 7.2(j), 56.1.

that Union officials have discouraged him from recruiting Hispanic individuals for the Union.  Dkt. # 52-7, at 35.

St. John is a not-for-profit medical facility in Tulsa, Oklahoma and it began a series of construction and renovation projects in 1999.  Manhattan Construction (Manhattan) was the general contractor.  St. John established a budget to hire temporary workers and classified the temporary workers as "713" employees.  General Acoustics (GA), a contract labor service, provided carpenters to St. John for its construction projects, but its employees were not considered 713 employees of St. John.[2]  Perez was an employee of GA and, in 2001, he was assigned to work as a temporary carpenter at St. John.  In February 2003, St. John hired Perez as a 713 temporary carpenter, and he was considered an employee of St. John, rather than GA, from that time.[3]  Perez's supervisor was David Wayne Hurst, Sr., Director of Renovations at St. John.  After Perez had worked for St. John for some time, Hurst assigned Perez to work as a liaison between the Manhattan crews and hospital staff.

On September 6, 2006, another Union member accused Perez of violating Union rules, and a charge was filed against Perez.  Dkt. # 42, Ex. B, at 4.  Perez was accused of accepting a check for $125 for attending a June 17, 2006 council meeting when he did not attend the meeting.  Dkt. # 54-8, at 30.  A hearing was held on February 16, 2007, and Perez defended himself against the charge.  Dkt. # 42, Ex. B, at 4.  On May 19, 2007, the Trial Committee of the Union presented a report

---

[2]     Plaintiff continually refers to GA temporary contractors as "712" employees of St. John. However, Dewey William Davis, St. John's Vice President of Property/Facilities Managment, testified that 712 is a code for "plant operations and HVAC shop" employees, and there are no 712 carpenters employed by St. John.  Dkt. # 43, Ex. B, at 6-7.

[3]     There is also a separate category of employees referenced by plaintiff known at "714" employees.  These employees are permanent employees of St. John's maintenance department.  Dkt. # 43, Ex. B, at 6-7.

finding that Perez had violated Union rules and fined him $2,000.  Id.  Perez filed an internal appeal

of the Trial Committee's decision, and his appeal was granted in part and denied in part.  Perez later

paid the fine and his status as a Union member was not affected by this incident.  Id., Ex. A, at 5.

In March 2007, Hurst decided that it was no longer necessary to have a liaison for the

Manhattan crews and assigned Perez to perform carpentry work.[4]  Dkt. # 43, Ex. C, at 16.  In or

about August 2007, Davis directed Hurst to reduce his workforce due to budget limitations and lack

of work.  Id., Ex. B, at 3-4.  Hurst spoke to employees supervising individual projects and asked for

a list of employees that were necessary to complete any remaining projects.  Id., Ex. C, at 28.  At

the time, Perez was working on a carpentry project on the sixth floor of the hospital's Chapman

Tower as part of the renovation of the labor and delivery unit.  The project was set for completion

in October 2007.  The supervisor of this project, Cecil Allison, did not identify plaintiff and three

GA carpenters as employees that he wanted to keep to finish the sixth floor renovations.  St. John

claims that it did not have any other openings for a 713 carpenter and Perez was laid off.[5]  Dkt. #

43, Ex. C, at 23-25.  A total of four GA carpenters were laid off at the same time, and three of those

carpenters were working on the sixth floor renovations.  Id., Ex. D, at 2.  St. John claims that neither

Union President, Wayne Eddings, nor the Union was involved with the decision to lay off or retain

---

[4]     Perez claims that this change in his job duties was a demotion.  However, he remained
        classified as a 713 carpenter and he has not presented evidence that his hours or pay were
        affected by this change in duties.

[5]     St. John has produced a copy of the Termination Notification.  See Dkt. # 43, Ex. F.  There
        is a section of the form entitled "Eligibility for Re-Employment" and the "yes" box is
        checked.  However, the document does not state that plaintiff would be considered for
        rehiring without an application and it clearly states that plaintiff was laid off due to a "[l]ack
        of work."  Id.  Hurst's deposition testimony also shows that St. John did not have a
        procedure for rehiring laid off employees without reapplication for employment. Dkt. # 52-
        10, 34 ("He's eligible for rehire.  I didn't – I wouldn't probably – I didn't say I'd call him
        back.  I said he was eligible for rehire.").

any employee in August 2007.  The sixth floor renovation was completed around October 1, 2007.  Dkt. # 52-10, at 42.

Perez does not dispute that work was slowing down at St. John, but states that St. John could have laid off other carpenters with less seniority and kept him on staff at least until the sixth floor renovations were completed in October 2007.  Dkt. # 52, at 4.  Perez believes that he was the only Hispanic 713 carpenter laid off in August 2007, but he does not know how many Hispanic 713 carpenters worked at St. John.  Perez also claims that St. John subsequently hired Mike Pendleton to fill his position, but Pendleton testified that he was hired to replace Larry Faucet, a carpenter working on third floor renovations who had resigned.   Dkt. # 43, Ex. H, at 3.  Pendleton also testified that he was hired by St. John as a 713 carpenter on March 11, 2007, just over  five months before plaintiff was laid off.  Id.  It is also undisputed that St. John has not requested any referrals for carpenters from the Union and has not hired any 713 carpenters since August 2007.  Dkt. # 42, Ex. A, at 5.

Perez claims that Hurst and Eddings harassed him throughout his employment with St. John.  Eddings was not an employee of St. John but, instead, was employed by GA.[6]  Perez states that Eddings repeatedly called him a "wetback."  Dkt. # 52-2, at 42-44.  He also claims that, in 2001 or 2002, Eddings observed Perez meeting his wife, an employee of St. John, for lunch, and told Perez that he should not date white women.  Id. at 42.  Perez states that Eddings referred to African-Americans as "porch monkeys" and "blue gums."  Dkt. # 52-4, at 21.  Perez did not report Eddings' conduct to anyone at St. John, because he claims that Hurst threatened to fire him if he reported any

---

[6]     Perez acknowledges that Eddings was not employed by St. John, but argues that Eddings engaged in discriminatory conduct with Hurst present and Hurst did not expressly disavow Eddings's conduct.  He implies that any discriminatory conduct by Eddings in Hurst's presence should also be attributed to Hurst.  See Dkt. # 52, at 4.

discriminatory conduct.  Dkt. # 52-2, at 46; Dkt. # 52-3, at 42.  Perez states that Hurst also called

him a "wetback," but cannot recall how many times this occurred or when these statements occurred.

He also states that this tapered off as Perez's employment continued.  Dkt. # 43, Ex. A, at 12-13.

Perez states that Hurst and Eddings called him a "wetback" about 20 times a year from 2001 to

2007, but he cannot recall a date for any specific incident.

On March 7, 2008, Perez filed a charge of discrimination alleging that St. John terminated

his employment based on national origin discrimination, and filed a separate charge alleging that

the Union and its officers harassed him by filing an internal grievance against him and making racial

slurs.  Dkt. # 63, Ex. F (EEOC charge against St. John); Dkt. # 42, Ex. H (EEOC charge against the

Union).  On July 31 or August 1, 2008, Perez called Andrea Ethridge, Director of Internal Audit at

St. John, and alleged that he was the victim of racial discrimination.  Dkt. # 43, Ex. I, at 4.  Perez

filed an application for employment with St. John on October 8, 2008, but Perez was not rehired.

Dkt. # 54-4, at 28.  On November 25, 2008, plaintiff filed a second charge of discrimination alleging

that St. John's retaliated against him for filing his initial charge by failing to rehire him.  Dkt. # 43,

Ex. J.  In his charge, he alleges that "other similar situated Carpenters not of my protected class were

being re-hired back to work from layoff by [St. John]."  Id.

After Perez was laid off, he asked the Union to place his name on the out-of-work list, and

the Union complied with his request by adding his name to the list on August 22, 2007.  Dkt. # 42,

Ex. B, at 3.  In accordance with Union policy, Perez's name was initially placed on the bottom of

the list and fifty other people were on the list ahead of him.  Id.  He moved up to position number

3 on the list by July 15, 2008.  Id.  Beginning in July 2008, Perez received calls for job referrals from

the Union's out-of-work list.  Id., Ex. C, at 3.  However, Perez turned down or refused to respond

to four referrals, because the jobs would have required Perez to travel outside of Tulsa for work. On January 23, 2009, Perez accepted a referral for a job at a Walgreens Pharmacy in Owasso, Oklahoma and, after he had worked for at least five days, his name was taken off the out-of-work list. Id., Ex. A, at 4. The Union claims that Perez has not asked to have his name placed on the out-of-work list since that time, but Perez disputes this.

Plaintiff's amended complaint alleges five claims: (1) national origin discrimination based on layoff, failure to rehire, or failure to refer plaintiff in violation of Title VII against St. John and the Union; (2) national origin discrimination based on layoff and failure to rehire in violation of 42 U.S.C. § 1981 against St. John and the Union; (3) violation of an Oklahoma public policy based on an alleged failure to rehire or refer plaintiff based on national origin discrimination against St. John and the Union; (4) claims of libel, slander and intentional infliction of emotional distress under Oklahoma law against the Union only; and (5) retaliation for protected activity in violation of Title VII against St. John and the Union.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendants argue that plaintiff has no evidence of national origin discrimination other than the fact that St. John has not rehired him, and plaintiff cannot establish a prima facie case of discrimination under any theory. Defendants also argue that the evidence plaintiff can rely on is limited by the 300 day time limit to file an EEOC charge, and any act occurring outside of the 300 day period may not be considered. Plaintiff responds that there was no need to include him as part of the August 2007 layoff, and St. John used the layoff as an excuse to terminate plaintiff's employment. He claims there is sufficient evidence of national origin discrimination and the Union's involvement with his termination to proceed with his claims against both defendants.

**A.**

The first issue the Court must consider is what evidence plaintiff may rely on to support his claims of unlawful discrimination.  Defendants argue that plaintiff is precluded from using any evidence of acts occurring more than 300 days before he filed his EEOC charge.  Plaintiff responds that he worked in a hostile work environment from 2001 to 2007, and he has brought his claims within the applicable statute of limitations.

Plaintiff does not clearly address this legitimate problem identified by defendants, and the 300 day statute of limitations does limit the scope of plaintiff's claims.  "Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996) (internal quotation marks and citation omitted).  To exhaust administrative remedies, a plaintiff must timely file a charge of discrimination with the EEOC.  See 42 U.S.C. § 2000e-5(b).  For a charge to be timely in a deferral state like Oklahoma,[7] the charge must be filed within 300 days of the last discriminatory act.  See id.  Even if a charge is timely filed, acts outside of the 300 day period may not be used as evidence to prove a claim of discrimination but may be used as background information.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  If the plaintiff alleges that acts outside of the statutory time period contributed to a hostile work environment, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."  Tademy v. Union Pacific Corp., 520 F.3d 1149, 1156 (10th Cir. 2008).

---

[7]     Whether a state is deferral or non-deferral depends on the existence of state or local fair employment practice agencies.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); Shempert v. Harwick Chem. Corp., 151 F.3d 793, 796 n.3 (8th Cir. 1998).

However, each discrete act of discrimination starts its own 300 day limitation period for filing a charge as to that act.  Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006).

Neither plaintiff's EEOC charges nor his amended complaint reasonably alleges any claim based on a hostile work environment theory and many of the events he relies on to support his claims occurred long before May 12, 2007.[8]  Plaintiff states that he has "clearly brought [his claims] within the applicable statute of limitations of the alleged discrimination," but this is plaintiff's full response to defendants' argument on this issue.  Plaintiff has not made any attempt to establish that his claims fall within the continuing violation doctrine applicable to hostile work environment claims.  Even if he had made such an attempt, he did not exhaust his administrative remedies for or plead any claim based on a hostile work environment theory, and the attempt would be futile.  Due to plaintiff's failure to allege a hostile work environment claim, the Court finds that he may not rely on any act outside of the limitations period other than as background for employment discrimination claims.  See Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340 (7th Cir. 1999) ("Generally, a plaintiff is only allowed to base a Title VII suit on conduct occurring within the limitations period.").

### B.

Defendants argue that plaintiff was laid off due to lack of work, and there is no evidence suggesting that plaintiff was terminated or laid off based on national origin discrimination.  Plaintiff responds that the alleged lack of work is pretext for national original discrimination and, in part, he

---

[8]     The Court notes that plaintiff's claims against the Union are based on alleged harassment due to plaintiff's national origin.  However, the primary basis for the harassment claim is the allegedly false charge of theft filed against plaintiff in September 2006, and this is a discrete act of discrimination.  He does generally allege that he was subject to harassment and "racial slurs," but he makes no attempt to allege a hostile work environment claim in his amended complaint.  See Dkt. # 38.

relies on evidence concerning an ongoing dispute with the Union that he claims influenced his employment with St. John.

Plaintiff does not have direct evidence of discrimination and the Court must apply the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis when reviewing plaintiff's claims.  Plaintiff must first establish a prima facie case of national origin discrimination. Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008).  This requires plaintiff to produce evidence raising a genuine issue of material fact that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged, and (4) the job was not eliminated after his discharge."  Rivera v. City and County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).  If plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to come forward with a legitimate non-discriminatory reason for any adverse employment action.  Adamson v. Multi Community Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  If the defendant provides a legitimate, non-discriminatory reason for its actions, the burden shift to the plaintiff to show that the defendant's explanation is pretextual.  Young v. Dillon Cos., Inc., 468 F.3d 1243, 1249 (10th Cir. 2006).

There is no dispute as to the first three elements of plaintiff's prima facie case as to his claim that he was laid off based on national origin discrimination.  Plaintiff is a member of a protected class based on his national origin.  St. John does not dispute that plaintiff was qualified for his job and states that plaintiff received good reviews from Hurst.  Dkt. # 43, at 6.  There is also no dispute that plaintiff was discharged from his job in August 2007.  St. John claims that plaintiff cannot establish the fourth element of a prima facie case based on his discharge, because St. John has not hired a 713 carpenter since August 2007 and plaintiff's position has been eliminated.  However, the

Tenth Circuit has found that a plaintiff may be able to make a prima facie case without this element if other evidence suggests an unlawful employment action occurred. Adamson, 514 F.3d 1136, 1150-51 (10th Cir. 2008) ("the fact a plaintiff's job was or was not eliminated after her discharge is not necessarily conclusive of [his] prima facie case"). St. John argues that plaintiff was laid off due to lack of work and it has not rehired a 713 carpenter to replace him. Dkt. # 43, Ex. D, at 3. Plaintiff responds that his deposition testimony provides evidence raising a genuine issue of material fact that Pendleton was hired to replace him.[9] Dkt. # 52-4, at 37. This deposition testimony is ambiguous, because plaintiff also states that St. John did not hire any new 713 carpenters after he was laid off. Id. However, plaintiff's burden to establish a prima facie case is "so light that only the most baseless of claims fails to satisfy it," and "the heavy lifting of proving and defending a Title VII case occurs in the later stages of the McDonnell Douglas analysis." Zamora v. Elite Logistics, 478 F.3ed 1160, 1171 (10th Cir. 2007). The Court finds that plaintiff's deposition testimony is sufficient to satisfy his burden to support each element of a prima facie case, and will proceed with the McDonnell Douglas analysis.

St. John argues that it laid plaintiff off due to a lack of work and this is a legitimate non-discriminatory reason explaining its decision to terminate plaintiff's employment. Dkt. # 43, at 11-12. Defendant has the burden to "articulate some legitimate, nondiscriminatory reason" for plaintiff's termination. McDonnell Douglas Corp., 411 U.S. at 802-03. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination;

---

[9]   The Court notes that plaintiff's deposition testimony is incorrect on this point. Pendleton testified that he was hired in March 2007 to replace Larry "Butch" Faucet. Dkt. # 52, Ex. 3, at 6. Plaintiff was laid off in August 2007, and it is not clear how Pendleton could be viewed as a replacement for plaintiff. Even with this misstatement, plaintiff's deposition could be read broadly to state that his position was not eliminated and the Court will not dispose of plaintiff's termination claim due to a failure to establish a prima facie case.

the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora, 478 F.3d at 1165. Defendant's explanation for plaintiff's discharge is supported by Hurst's deposition testimony describing the lack of work and the procedure for determining who would be laid off due to the limited carpentry work. See Dkt. # 43, Ex. C, at 23, 25. Plaintiff responds that this is not a legitimate, non-discriminatory reason, because it does not reflect good business judgment by St. John and is unworthy of belief. The Court will consider these arguments as part of plaintiff's burden to show that St. John's stated reason is pretextual, because St. John's explanation clearly satisfies its burden to provide a legitimate, non-discriminatory reason for terminating plaintiff's employment.

At this stage of the proceeding, the burden shifts to plaintiff to show that defendant's explanation for terminating plaintiff's employment is pretextual. Plotke, 405 F.3d at 1099; Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)). A plaintiff typically attempts to satisfy his burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting

13

Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff claims that he was the only Hispanic 713 laid off in August 2007 and relies on alleged racial slurs made over the course of six years made by Hurst and Eddings, as well as Hurst's references to Union disciplinary matters,  to show that St. John's explanation is pretextual.  Plaintiff acknowledges that there was a lack of work and does not refute that his discharge was part of a reduction in force.  Dkt. # 52, at 3.  However, he claims that St. John could have found a way to keep him on the payroll and he was capable of performing other work for which St. John had open positions.  Dkt. # 52, at 6, 8, 16-18.  St. John responds that Union matters have no relevance to a claim of discrimination based on national origin, and the Court may not consider St. John's business judgment unless plaintiff provides other evidence suggesting that he was laid off due to unlawful discrimination.

Plaintiff's argument that Hurst laid off plaintiff, in part, based on a Union disciplinary matter is irrelevant to his claim of national origin discrimination.  Plaintiff attempts to tie the Union matter to a claim of national origin discrimination by arguing that Union had a history of discriminating against plaintiff on the basis of his national origin and this implies that Hurst also discriminated against plaintiff due to his national origin by taking the Union's side on a disciplinary matter involving plaintiff.  The evidence establishes that Hurst may have admonished plaintiff for not paying a fine imposed by the Union, see Dkt. # 52-3, at 28-31, but it is unclear how this supports plaintiff's claim of national origin discrimination.  Assuming that the Union historically evidenced some hostility toward plaintiff based on his national origin, plaintiff has not provided any legal

authority showing that any hostility shown by the Union is imputed to Hurst or St. John for the purpose of a Title VII claim. St. John has produced evidence that plaintiff filed a complaint against St. John with the NLRB alleging that he was wrongfully terminated because "he received, and allegedly failed to comply with, union discipline or fines." Dkt. # 63, Ex. E. The NLRB was the appropriate forum to resolve this issue, and Hurst's position on discipline imposed by the Union is not relevant to a Title VII claim.

The Court will also not consider whether St. John could have or should have retained plaintiff for purely business reasons. Plaintiff claims that GA employees cost St. John at least four to five dollars more per hour than a 713 carpenter, and St. John's decision does not make good business sense. Dkt. # 52, at 16. Plaintiff must show that defendant's stated reason for terminating his employment, a reduction in force, is pretext for unlawful discrimination. This Court will not second-guess St. John's business judgment in determining who to include as part of a reduction in force. See Rivera, 365 F.3d at 924-25 ("The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."); Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1330 (10th Cir. 1999) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments."). In any event, St. John disputes plaintiff's assertion that GA employees cost more per hour, and has provided evidence showing that GA employees were paid the same hourly rate. Dkt. # 63, Ex. G, at 11. St. John pays an additional four to five dollars per hour to GA to compensate GA for benefits provided to these employees, but St. John employees, such as 713 carpenters, receive the same benefits as part of their employment package. Id. Even if there were some difference in pay between GA and 713

carpenters, St. John has produced evidence refuting plaintiff's assertion that there would be a significant cost saving for retaining a 713 carpenter over a GA employee. Plaintiff's unsubstantiated assertion is not evidence  that St. John used a reduction in force as pretext to mask unlawful discrimination.

Plaintiff argues that Hurst and Eddings made disparaging remarks about plaintiff based on his national origin.  Plaintiff testified in his deposition that Hurst and Eddings called him a "wetback" repeatedly between 2001 and 2007, and told plaintiff that he would be fired if he reported their conduct.  Dkt. # 52-2, at 43-45.  He states that Hurst and Eddings called him a "wetback" about twenty times per year, but he does not recall the exact number of statements or who made every statement.  Id. at 44.  Plaintiff could not recall a specific instance when Hurst called him a "wetback" and most of the comments were made by Eddings, but plaintiff claims that Hurst was present when Eddings made these remarks and refused to reprimand Eddings.  Id. at 46.  He states that this conduct tapered off and most of the comments occurred during the beginning of his employment. Dkt. # 52-3, at 1. Plaintiff also testified about an incident that occurred in 2001 before he was an employee of St. John.  Plaintiff met his wife, a St. John employee, for lunch.  He states that Eddings called him to an informal meeting and "told [plaintiff] not to date white women, and that [he] ought to go back to Mexico and get one of those short, little fat ones."  Dkt. # 52-2, at 42-43.  St. John responds that Eddings called plaintiff a wetback in jest.  Dkt. # 43, at 11.  St. John also argues that plaintiff's deposition testimony is so vague that it does establish that Hurst actually made any of the alleged statements or made these statements near enough to plaintiff's layoff to be relevant to his claim of national origin discrimination.  Id. at 19.

The Court finds that plaintiff may rely on these events as background for his claims, but they are not directly relevant to his termination claim.  Viewing the evidence in a light most favorable to plaintiff, some derogatory statements about plaintiff's national origin may have occurred as late as 2007, but his testimony is so general that it is not clear if Hurst made any of these statements.  Plaintiff's deposition testimony establishes that most of the statements are attributable to Eddings and Hurst was merely present when they occurred.  Plaintiff could not recall any specific statement made by Hurst, except to note that Hurst called him a wetback while he was employed with GA, and he claims that Hurst was present when Eddings called him a wetback at unspecified times.  Plaintiff was laid off in August 2007, and there is no evidence suggesting that any comments were made near that time.  This evidence might provide background for plaintiff's claims, but it does not establish that St. John's legitimate, non-discriminatory reason for terminating his employment is unworthy of belief.

St. John has produced evidence showing that it laid off plaintiff due to a lack of work and plaintiff has not carried his burden to show that St. John's stated reason is pretext for unlawful discrimination.  Even assuming that Hurst involved himself in a dispute between plaintiff and the Union, this does not create an inference that plaintiff was fired because of his national origin.  Plaintiff's deposition testimony is so general that it does not support an inference that any discriminatory conduct occurred near the time he was laid off or, even if some statements were made, that Hurst or any other employee of St. John made them.  Plaintiff's argument that St. John made a poor business decision by laying off plaintiff instead of another employee is not evidence of national origin discrimination, and the Court will not substitute its business judgment for that of plaintiff's former employer.  Considering all of the evidence, plaintiff has not identified a genuine

issue of material fact which could support an inference that St. John's legitimate, non-discriminatory reason for laying off plaintiff is pretextual, and St. John is entitled to summary judgment on this claim.

## C.

Plaintiff claims that St. John failed to rehire him when new positions became available, and asserts that St. John's refusal to rehire him is a discrete act of national origin discrimination attributable to both defendants.  Defendants argue that plaintiff can not establish a prima facie case of national origin discrimination and, even if plaintiff can meet this burden, he has no evidence that St. John's legitimate, non-discriminatory reason for not rehiring plaintiff is pretextual.  Plaintiff responds that his deposition testimony provides evidence that St. John did have open positions for 713 carpenters after August 2007, and St. John refused to consider him for those positions.

Plaintiff's amended complaint includes a Title VII claim, a § 1981 claim, and a Burk tort based on St. John's failure to rehire him.  Plaintiff cannot proceed with a Burk tort on a failure-to-rehire theory, because a Burk tort is available only for wrongful termination in violation of an Oklahoma public policy.[10]  Kruchowski v. Weyerhaeuser Co., 202 P.3d 144, 154 (Okla. 2008) ("the Burk claim's actionable character is anchored solely in the employer's discharge in breach of Oklahoma's public policy); Vasek v. Board of County Comm'rs of Noble County, 186 P.3d 928, 932 (Okla. 2008) (first element of a Burk tort is "an actual or constructive discharge").  Thus, the Court will consider only plaintiff's federal claims based on an alleged failure to rehire due to national origin discrimination.

---

[10]   St. John raised this issue in its motion for summary judgment, see dkt. # 43, at 22-23, and plaintiff did not respond to this argument.  This argument also applies to his failure to refer claim against the Union and, for the same reason, he may not proceed with a Burk tort based on an alleged failure to refer him for work from the out-of-work list.

Plaintiff's failure to rehire claims are based on circumstantial evidence, and the Court must apply the <u>McDonnell Douglas</u> framework to plaintiff's claims under Title VII and § 1981.  <u>Antonio v. Sygma Network, Inc.</u>, 458 F.3d 1177, 1181 (10th Cir. 2006); <u>Salguero v. City of Clovis</u>, 366 F.3d 1168, 1175 (10th Cir. 2004).  To establish a <u>prima</u> <u>facie</u> case of failure to hire or rehire, a plaintiff must produce evidence showing that:

> (1) plaintiff belongs to a protected class; (2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite being qualified, the plaintiff was rejected; and (4) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications.

<u>Fischer v. Forestwood Co., Inc.</u>, 525 F.3d 972, 982-83 (10th Cir. 2008) (quoting <u>Garrison v. Gambro, Inc.</u>, 428 F.3d 933, 937 (10th Cir. 2005)).  Plaintiff must produce evidence showing that he actually reapplied for employment after he was laid off.  <u>Garcia v. Pueblo Country Club</u>, 299 F.3d 1233, 1238 (10th Cir. 2002).  If plaintiff establishes a <u>prima</u> <u>facie</u> case of national origin discrimination based on a failure to rehire, the burden shifts to St. John to produce a legitimate non-discriminatory explanation for failing to rehire plaintiff and plaintiff will have the burden to show that St. John's explanation is pretextual.

There is no dispute that plaintiff is a member of a protected class, but it is not clear that plaintiff can establish the other elements of a <u>prima</u> <u>facie</u> case for failure to rehire.  Plaintiff simply refers to his arguments on his termination claim and states that "St. John did not have to lay off [plaintiff]."  Dkt. # 52, at 24.  He does not cite any evidence that he actually reapplied for a position with St. John after he was laid off, and apparently believes it is sufficient that St. John could recall him from layoff status.  <u>Id.</u> at 25.  However, he provides no factual support or legal authority for this argument.  The Court has reviewed the summary judgment record and located plaintiff's deposition

19

testimony establishing that he reapplied for employment with St. John on October 8, 2008. Dkt. # 52-4, at 28. This evidence is sufficient to satisfy the second element of his prima facie case on a failure to rehire theory. Plaintiff has not been rehired by St. John and plaintiff can establish the third element of a prima facie case. St. John asserts that it does not have an open position for a 713 carpenter and plaintiff cannot show that St. John continued to seek applicants after failing to rehire him. Plaintiff claims that Pendleton resigned on October 15, 2008, and St. John has not hired a new 713 carpenter. Dkt. # 52, Ex. 3, at 5. He also claims that another opening was created when John Ruark resigned on June 1, 2009, and this position has not been filled. Dkt. # 52-10, at 28. There is evidence that both Pendleton and Ruark resigned, but Hurst did not testify that St. John would be hiring anyone to replace either former employee. Id. at 29-30. The Court will assume that plaintiff can satisfy the fourth element of a prima facie case based on evidence that St. John may have an open position.

St. John claims that it has not hired a 713 carpenter since plaintiff was laid off in August 2007, and this is a legitimate, non-discriminatory reason for failing to rehire plaintiff. Even though plaintiff claims that this is inaccurate, St. John has stated a legitimate, non-discriminatory reason for failing to rehire plaintiff since August 2007. The burden shifts to plaintiff to show that St. John's legitimate, non-discriminatory reason is pretext for national origin discrimination.

Plaintiff refers to the same arguments and facts relied on for his termination claim in an attempt to show that St. John's failure to rehire him due to a lack of work is pretextual. In addition, plaintiff claims that St. John currently has two openings for a 713 carpenter and has refused to fill the positions to avoid rehiring plaintiff. Dkt. # 52, at 25. St. John responds that there are no openings for a 713 carpenter and there is no position for which plaintiff could be rehired, and

plaintiff's assertion that Pendleton's and Ruark's resignations have created open positions is incorrect.  Dkt. # 63, at 3.

To the extent that plaintiff reasserts his pretext arguments concerning his layoff, those arguments have been addressed and the Court has determined that no genuine issue of material fact precludes summary judgment in favor of St. John as to plaintiff's layoff.  The primary issue as to plaintiff's failure to rehire claims is plaintiff's contention that there are two open positions for a 713 carpenter, and St. John has not rehired him.  It is undisputed that construction work at St. John was slowing down before plaintiff's layoff in August 2007.  Dkt. # 43, at 11; Dkt. # 52, at 4.  Plaintiff and four GA employees were laid off as a result of the reduced workload.  He argues that he is eligible for recall from layoff status, but he admits that he was not promised in any way that he would be rehired.  Dkt. # 43, at 14; Dkt. # 52, at 6.  He claims that St. John has not considered him for any open positions, and there are at least two openings for a 713 carpenter.  He also asserts that St. John had a need for general maintenance employees and an electrician, and he could have been rehired to perform these services.  Dkt. # 52, at 21.

The Court finds that plaintiff has not carried his burden to show that St. John's legitimate, non-discriminatory explanation for failing to rehire him is pretext for discrimination.  Plaintiff has not produced any evidence showing that there is or has been an open position for a 713 carpenter since August 2007.  The mere fact that Pendleton and Ruark resigned does not create an inference that St. John needed or intended to replace them.  Plaintiff's assertion that "St. John has intentionally not replaced any 713 employees . . . to avoid recalling [plaintiff] from layoff or rehiring him" is completed unfounded and is not supported by any evidence.  On the other hand, St. John has produced evidence that the amount of construction work has been steadily declining and it has

reduced its workforce due to a decreased need for carpenters.  Plaintiff also argues that St. John could have rehired him to perform work other than carpentry and could have rehired plaintiff, instead of retaining a GA employee, to complete the work.  While St. John may have had other types of work available, the evidence shows that St. John had people on staff capable of performing that work and it did not need to rehire plaintiff.  The Court will not delve into plaintiff's argument that it would have made better business sense to rehire plaintiff, because that is not the Court's role when reviewing a discrimination claim.  In any event, St. John has cited evidence refuting plaintiff's theory that GA employees were more expensive that 713 carpenters, and St. John's decision to retain certain GA employees instead of plaintiff is not evidence of pretext.  Plaintiff has not shown that St. John's legitimate, non-discriminatory reason for failing to rehire him, a lack of work, is unworthy of belief or even subject to any doubt, and summary judgment should be granted in favor of St. John on plaintiff's failure to rehire claims.

### D.

Plaintiff alleges that the Union failed to refer him for work due to his national origin, because he was not referred for work from the out-of-work list in a reasonable amount of time and was not placed back on the out-of-work list in February 2009.  He relies on an alleged history of discriminatory acts by the Union and claims that the Union has repeatedly discriminated against him based on his national origin.  The Union responds that plaintiff has no evidence that he was treated any differently than any other Union member on the out-of-work list, and plaintiff has not produced any evidence that the Union discriminated against plaintiff by referring him for work.

Although the Tenth Circuit has not stated the elements of a prima facie case for a failure to refer claim against a union, this type of claim is analogous to plaintiff's claim of failure to rehire

against St. John. As slightly modified to fit plaintiff's failure to refer claim, a prima facie case for this type of claim requires the plaintiff to produce evidence that: (1) he is a member of a protected class; (2) he requested a referral and was qualified for available referrals; (3) he was not referred for work; and (4) other union members outside of the protected class were referred for work by the union. See Alexander v. Local 496, Laborers' Int'l Union of North America, 177 F.3d 394, 403 (6th Cir. 1999); Stair v. Lehigh Valley Carpenters Local Union No. 600 of the United Brotherhood of Carpenters and Joiners of America, 1993 WL 235491, *16 (E.D. Pa. 1993); Jackson v. Cement Masons Union, Local 382, 1989 WL 197431, *3 (N.D. Ill 1989). The Union argues that plaintiff cannot establish a prima facie case of national origin discrimination based on a failure to refer him for work, and the Court should not proceed further with the McDonnell Douglas analysis.

The first and second elements of plaintiff's prima facie case are not in dispute. Plaintiff is a member of a protected class and he placed his name on the out-of-work list on August 22, 2007. However, plaintiff may not rely on his August 22, 2007 request for placement on the out-of-work list to support a Title VII claim, because he cannot satisfy the third and fourth elements of a prima facie case. The undisputed facts show that plaintiff's name was placed on the list and he was referred for work when his name had moved high enough up the list. In fact, plaintiff turned down four job opportunities before accepting work a job in Owasso, Oklahoma on January 23, 2009. See Dkt. # 42, Ex. C, at 3; Id., Ex. D, at 3; Id., Ex. E, at 3. Viewed as an element of the prima facie case, plaintiff has no evidence of an adverse employment action because he was referred for work in the normal course of the Union's referral process.

Plaintiff's failure to refer claim may also be based on the Union's alleged failure to refer plaintiff for work specifically at St. John. Dkt. # 54, at 17-18. However, the evidence shows that

the out-of-work list does not operate on such a narrow basis.  Plaintiff does not dispute that a name is placed on the list and that person is called when the next available job for which he is qualified opens.  Dkt. # 42, at 5-6; Dkt. # 54, at 3-4.  Even assuming that the Union has referred other members to St. John, which the Union disputes, this does not show that the Union failed to refer plaintiff for work or manipulated the out-of-work list.  The Union also points out that the hiring hall is non-exclusive, meaning that St. John can hire carpenters without using the Union.  Plaintiff's allegations that St. John has hired carpenters does not establish that the Union referred anyone to St. John, and there is no evidence supporting plaintiff's assertion that the Union's failure to refer him to St. John for work is an adverse employment action.

Plaintiff also claims that the Union failed to put his name on the out-of-work list in February 2009 after he completed a job and had been out-of-work for at least five days.  This is a separate discrete act of discrimination and plaintiff was required to exhaust his administrative remedies before pursuing a claim based on this allegation.  "Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."  Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996) (internal quotation marks and citation omitted).  To exhaust administrative remedies, a plaintiff must file a timely charge of discrimination with the EEOC.  See 42 U.S.C. § 2000e-5(b). The Tenth Circuit has held that "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  MacKenzie v. Denver, 414 F.3d 1266, 1274 (10th Cir. 2005).  Thus, if the EEOC should not be reasonably  expected to investigate a plaintiff's claim or its underlying factual allegations, a court does not have jurisdiction to consider the matter. Plaintiff filed his second EEOC charge on November 12, 2008, but it asserted only a retaliation claim against

24

St. John.  Plaintiff's original EEOC charge was filed on March 7, 2008, and the event in question did not occur until almost a year later.  There is no possibility that plaintiff has exhausted his administrative remedies for a failure to refer claim based on alleged failure to place his name on the out-of-work list in February 2009, and the Court may not consider this claim.

Even if the Court were to assume that plaintiff could establish a prima facie case for a failure to refer claim, the Union also argues that there is no evidence that its legitimate, non-discriminatory explanation for not referring plaintiff for work to St. John is pretext for discrimination.  The Union states that it complied with its internal procedures concerning the out-of-work list, and plaintiff was referred for work when his name reached the top of the list and a job became available.  This is a legitimate, non-discriminatory explanation.  The Court has reviewed the summary judgment record and there is no evidence casting doubt on the Union's explanation. Plaintiff admits that he placed his name on the out-of-work list on August 22, 2007, and he was called in the normal course of business when his name climbed up the out-of-work list.  In fact, the Union began referring plaintiff for jobs in July 2008, and he turned down four jobs before accepting a job referral in January 2009.  As the Court has explained, it cannot consider plaintiff's allegation that he was not placed on the out-of-work list in February 9, 2009, due to his failure to exhaust administrative remedies.  Plaintiff claims that the Union has a history of engaging in discriminatory actions against him.  However, these alleged events occurred long before August 2007 and there is no indication that the Union treated plaintiff differently than any other member on the out-of-work list.  Thus, the Union is entitled to summary judgment on plaintiff's failure to refer claim because he cannot establish a prima facie case or show that the Union's legitimate, non-discriminatory reason for not referring plaintiff is pretext for discrimination.

25

**E.**

Plaintiff has also alleged a retaliation claim against St. John for refusing to hire him after he filed a charge of discrimination against St. John on March 7, 2008.[11]  He claims that St. John failed to rehire him in retaliation for filing that charge.  St. John responds that plaintiff did not actually apply for reemployment until October 8, 2008 and, even if he had reapplied sooner, St. John did not have any open positions for a 713 carpenter.

Under Title VII, it is unlawful for an employer to take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination.  42 U.S.C. § 2000e-3(a).  To prove a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the opposition and the adverse action.  Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004).  The law is clear that reporting workplace discrimination to the EEOC is protected behavior.  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999); McCue v. State of Kansas, Dep't of Human Resources, 165 F.3d 784, 789 (10th Cir. 1999).  An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity.  Annett v. University of Kansas, 371 F.3d 1233, 1239-40 (10th Cir. 2004); Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982).  "Unless there is a very close temporal proximity between the protected activity and the

---

[11]    The summary judgment record contains a charge of discrimination filed on November 12, 2008 by plaintiff against St. John alleging retaliation, but this charge does not reference the Union.  Plaintiff has not produced a charge alleging retaliation against the Union, and it is not clear that he exhausted his administrative remedies against the Union for a retaliation claim.

retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).

The summary judgment record contains evidence that plaintiff filed separate EEOC charges on March 7, 2008 alleging that St. John and the Union discriminated against him on the basis of his national origin.  Dkt. # 42, Ex. H; Dkt. # 63, Ex. F.  Both charges assert that defendants took an adverse employment action against plaintiff because he refused to pay a fine imposed by the Union. Even if plaintiff had filed a charge alleging retaliation by Union, he cannot establish a prima facie case of retaliation because he cannot show that he suffered an adverse employment action caused by the Union.[12] The evidence shows that Union did refer plaintiff for work from the out-of-work list beginning in July 2008, and plaintiff repeatedly turned down the job offers.  At the time he filed his retaliation charge against St. John on November 12, 2008, the Union was actively referring work to plaintiff and there is no evidence that the Union retaliated against plaintiff in any way for filing a charge of discrimination.

Plaintiff can satisfy the first and second elements of a prima facie case of a retaliation claim against St. John.  He filed a charge of discrimination against St. John on March 7, 2008, and engaged in protected activity of which St. John was aware.  He also reapplied for employment on October 8, 2008, and he was not rehired.  Plaintiff's claims that St. John's failure to rehire him between March 7 and October 8, 2008 was also an adverse employment action but, as the Court has already discussed, plaintiff's Termination Notification cannot reasonably be construed as creating an

---

[12]     Plaintiff's amended complaint alleges that he filed a charge of discrimination alleging retaliation by the Union on November 12, 2008. Dkt. # 38, at 8.  However, this charge is not part of the summary judgment record.  Assuming that plaintiff filed such a charge, it is clear that he cannot proceed with a retaliation claim against the Union, because the Union was referring plaintiff for jobs from the out-of-work list and there was no adverse employment action.

expectation that plaintiff could be rehired without reapplication for employment.  See Dkt. # 43, Ex. F.  Consequently, the Court's review of his retaliation claim is limited to alleged retaliation based on a failure to rehire plaintiff  in October 2008.  Approximately seven months passed between the filing of plaintiff's original EEOC charge and his application for reemployment, but these events are not so close in time as to create an inference that St. John's failure to rehire plaintiff was an act of retaliation.   See Fye v. Oklahoma Corp. Comm'n, 516 F.3d 1217 (10th Cir. 2008) (period of two weeks between protected activity and termination was sufficient to establish causal connection); Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006) (plaintiff's termination over seven months after engaging in protected activity was insufficient to prove causation for a retaliation claim).   Plaintiff does not directly address the issue of causation in his response, but it appears that he intends to reassert his arguments concerning the dispute with the Union, St. John's business reasons, and the history of alleged discrimination by the Union, to establish a causal connection.  See Dkt. # 52, at 25-26.  There is simply no causal connection between any of these events and St. John's decision not to rehire plaintiff in October 2008.  Even if the Court were to find some causal connection and to assume that plaintiff could establish a prima facie case of retaliation, St. John has a legitimate, non-discriminatory explanation for not rehiring plaintiff, a lack of work and no need to hire a 713 carpenter.  For the reasons stated above, plaintiff cannot carry his burden to show that St. John's legitimate, non-discriminatory explanation is pretextual.  Due to plaintiff's failure to establish a prima facie case and produce evidence of pretext, defendants are entitled to summary judgment on plaintiff's retaliation claims.

**F.**

The Union also seeks dismissal of plaintiff's state law claims of intentional infliction of emotional distress and defamation for lack of evidence and expiration of the statute of limitations. Dkt. # 42, at 20-23.  Plaintiff does not respond to these arguments, except to the extent that he asks the Court to deny the Union's motion for summary judgment as to all of his claims.  Dkt. # 54, at 6, 21.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See, Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arounse his resentment against the actor, and lead him to exclaim, 'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46

29

standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law. If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability. Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress. Id. Exercising its gatekeeper function, the Court finds that plaintiff has not produced evidence demonstrating that a genuine issue of fact exists upon which a factfinder could conclude that the Union engaged in extreme and outrageous conduct or that he has suffered extreme emotional distress.

The statute of limitations for a claim of intentional infliction of emotional distress is two years. OKLA. STAT. tit. 12, § 95; Miller v. Miller, 956 P.2d 887, 895 n.15 (Okla. 1998). Plaintiff filed this case on September 12, 2008, and he must show that some act occurred after September 12, 2006, giving rise to an intentional infliction of emotional distress claim against the Union. Most of the events relied up by plaintiff to support his claims occurred much earlier, and the Court cannot consider a general history of alleged discriminatory conduct as evidence of extreme and outrageous conduct. Even assuming that some discriminatory remarks occurred after September 12, 2006 while plaintiff was still employed at St. John, he has not specifically identified the statements as to content or date, and his deposition testimony establishes that the statements tapered off towards the end of his employment. Plaintiff was disciplined by the Union in 2007, and the events giving rise to the disciplinary action occurred within the statute of limitations. He claims that the charges were baseless, but he acknowledges that the Union filed the proper procedures and reversed part of the findings against plaintiff following his appeal. See Dkt. # 42, Ex. B, at 4; Dkt. # 54, at 4. There is

no evidence that the charges had any effect on plaintiff's Union membership or the Union's willingness to refer him for jobs from the out-of-work list.

In addition, there is no evidence in the summary judgment record that plaintiff suffered severe emotional distress.  Plaintiff testified in his deposition that a lack of work has caused emotional distress, because it has been difficult for him to earn a living after losing his job at St. John.  Dkt. # 52-7, at 27-28.  However, this does not show that the Union's alleged misconduct has caused any emotional distress, let alone severe emotional distress, because the alleged emotional distress was caused by St. John's decision to terminate his employment, not any conduct by the Union or its officers.  Thus, plaintiff has not shown that the Union engaged in extreme and outrageous conduct or that he suffered severe emotional distress, and  summary judgment should be granted in favor of the Union on this claim.

The Union argues that plaintiff's defamation claim was not filed within the one year statute of limitations, because plaintiff has not produced any evidence of a defamatory statement made by the Union after September 12, 2007.  Plaintiff has not responded to this argument.  The Union is correct that the statute of limitations for a claim of libel or slander is one year.  OKLA. STAT. tit. 12, § 95; Davis v. Board of Regents for Oklahoma State University, 25 P.3d 308 (Okla. Civ. App. 2001). The Court has independently reviewed the summary judgment record to determine if plaintiff has produced evidence of a statement made by the Union or its officers between September 12, 2007 and September 12, 2008, but can find no evidence of any such statements.  The alleged "kangaroo court" where plaintiff was disciplined by the Union seems to be the basis for his defamation claim, see Dkt. # 38, at 7-8, but the hearing on the disciplinary matter took place on February 16, 2007 and the Union issued a final report disciplining plaintiff on May 19, 2007.  These events are not within the

one year statute of limitations and the record is silent about any statements made by Union officials during the applicable time period.  Thus, summary judgment should be entered in favor of the Union on plaintiff's state law claim of defamation.

**IT IS THEREFORE ORDERED** that Defendant Local 943's Motion for Summary Judgment and Brief in Support of the Motion (Dkt. # 42) and Defendant St. John Medical Center's Motion for Summary Judgment with Supporting Brief (Dkt. # 43) are **granted**.  A separate judgment is entered herewith.

**DATED** this 6th day of October, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT